UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EMPLOYERS MUTUAL CASUALTY
COMPANY, also known as EMC
INSURANCE COMPANIES,

       Plaintiff                                   08-cv-15276

v.                                         Judge Denise Page Hood

HAMED AL-MASHHADI, ADEL
KOBEISSI, SCHAEFER and PURITAN, INC.,
and SATTER AL-BAYDANNY also known as
SATAAR AL-BAYDANY,

       Defendants.

_____/

**ORDER DENYING DEFENDANT AL-BAYDANY'S MOTION TO DISMISS**
**AND**
**DENYING DEFENDANT AL-MASHHADI'S MOTION TO DISQUALIFY COUNSEL**
**AND**
**GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

I.       **INTRODUCTION**

This matter is before the Court on Plaintiff's Motion for Summary Judgment **[Docket No. 13, filed March 19, 2009]**. On April 7, 2009, Defendant Sattar Al-Baydany filed his Response **[Docket No. 22]**, to which Defendant Hamed Al-Mashhadi joined. On April 24, 2009, Plaintiff filed its Reply **[Docket No. 26]**; a motion hearing was held on April 29, 2009.

Also before the Court is Defendant Al-Baydany's Motion Requesting the Court to Abstain from Exercising Discretionary Jurisdiction **[Docket No. 16, filed March 31, 2009]**. On April 14, 2009, Plaintiff filed its Response **[Docket No. 25]**.

Additionally before the Court is Defendant Al-Mashhadi's Motion to Disqualify Counsel **[Docket No. 15, filed March 26, 2009]**. On April 9, 2009, Plaintiff filed its Reply **[Docket No.**

**23].**

## II.    STATEMENT OF FACTS

This is a declaratory action concerning the scope of coverage under an insurance policy provided by Plaintiff Employers Mutual Casualty Company ("EMC").

### A.    The Underlying Action

The facts of the underlying action are essentially undisputed.  On January 5, 2007, Sattar Al-Baydany was injured after being shot in the eye.  The shooting occurred on the premises of a Sunoco gas station located in Detroit, Michigan owned and operated by Schaefer & Puritan ("S&P").  This particular gas station is open 24 hours, and is described as being situated in an unsafe area.  According to Defendants, there have been prior robberies and shootings at the gas station, and customers have been known to threaten the employees.  The gas station is set up as a convenience store, where the cashier is stationed in a "caged area," where he or she is separated from the general public by a locked door and bulletproof plexiglas.

On the night of the shooting, S&P employee Hamed Al-Mashhadi was working a shift that began at 3:00p.m. and concluded at 11:00p.m.  Around 11:00p.m. another S&P employee Ahmad Al-Awad signed himself in for the 11:00p.m. to 7:00a.m. shift.  Al-Awad brought two friends with him to the gas station: Hussein Nabhan, and Al-Baydany who suffered the injury.  Apparently, all four of these individuals were friends and classmates at Dearborn's Fordson High School.  Al-Baydany testified that he was seeking employment for a position that would soon be opening at the gas station upon Al-Awad's departure overseas.

While the actual time of the shooting is disputed, most accounts of the incident indicate that Al-Mashhadi accidently discharged a .22 riffle while dancing around and posing for his

2

friends camera-phones.  According to Defendants, the riffle was purchased by employee Al-Awad with the authorization of the owner/manager Adel Kobeissi in order to protect the gas station.  Defendants also submit that the gun was purchased two to three weeks before the incident and that Kobeissi and other gas station employees were aware of the gun's presence.

Al-Baydany filed his initial complaint on April 27, 2007.  On February 19, 2009, Al-Baydany filed an amended complaint asserting negligence claims against Kobeissi, Al-Awad, Nabhan, and Al-Mashhadi, in addition to S&P under a theory of *respondeat superior* ("underlying lawsuit").  The underlying lawsuit, entitled *Al-Baydany v. Schaefer & Puritan, Inc., et al*, No. 07-711450, is currently pending before Judge Daphne Means Curtis in the Wayne County Circuit Court, State of Michigan.  Because S&P maintains a policy of insurance with EMC ("Policy"), EMC agreed to defend Al-Mashhadi subject to a reservation of rights.  Discovery is currently ongoing in the underlying lawsuit, and Al-Mashhadi has evoked his Fifth Amendment privileges regarding the actual incident.  In particular, Al-Mashhadi has declined to testify regarding what happened immediately before and during the discharge of the rifle.

EMC intervened in the underlying lawsuit by way of the state court's February 6, 2009 order granting its motion to intervene.  According to EMC, its entry was for the limited purpose of obtaining a stay in order to obtain declaratory judgment as to the parties rights under the Policy.

### B.    Current Proceedings

Plaintiff EMC initiated the declaratory suit before this Court on December 25, 2008, seeking a determination of its rights and the scope of its duties under the Policy toward Defendant Al-Mashhadi.  In so doing, EMC has named all of the parties in the underlying suit as

3

Defendants, and has recently obtained clerk's entries of default against S&P and Kobeissi.  In the declaratory action, EMC argues that it does not have a duty to defend or indemnify Al-Mashhadi in the underlying suit based upon the restrictions of the policy in effect from September 17, 2006 to September 17, 2007.

The coverage under the policy extended to employees of S&P.  According to the terms of the Policy, each of the following was considered an insured:

> [S&P's] "volunteer workers" only while performing duties related to conduct of your business, or your "employees", other than either your "executive officers"... or your managers ... but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business.

[Business Owners' Policy §2(c), Plaintiff's Mot. for Summ. J., Ex. E p. 35].  Based on this language, EMC argues that Al-Mashhadi cannot be considered "insured" for purposes of the Policy, because he was not acting (a) within the scope of his employment; or (b) performing duties related to the conduct of S&P.  Alternatively, EMC avers that the "bodily injury" as a result of the shooting was not a "covered occurrence," as determined by the following Policy language:

> [EMC] will pay those sums that the insured becomes legally obligated to pay as damages because of the "bodily injury" ... to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" ... to which this insurance does not apply.

[Business Onwers' Policy § 2(A), Plaintiff's Mot. for Summ. J., Ex. E p. 26].  Relying on a provision that specifically excludes from coverage any bodily injury that is "expected or intended from the standpoint of the insured," EMC submits that coverage for a bodily injury will only apply if the occurrence was an accident under Michigan law (i.e. it was not expected or

4

intended from the standpoint of the insured.).  EMC argues that Al-Mashhaddi's discharge of the riffle was not an accident, but rather, an intentional act for which coverage is precluded.

## III.    STANDARD OF REVIEW

Rule 56(c) provides that a summary judgment should be entered only where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The presence of factual disputes will preclude granting of summary judgment only if the disputes are genuine and concern material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed. 2d 202 (1986).  A dispute about material facts is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  Although the Court must view the motion in a light most favorable to the nonmoving party, where "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

Summary judgment must be entered against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed. 2d 265 (1986).  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Celotex Corp.*, 477 U.S. at 322-23.  A court must look to the substantive law to identify which facts are material.

5

*Anderson*, 477 U.S. at 248.

## IV.   LAW & ANALYSIS

### A.   Procedural Issues

At the outset, this Court is faced with certain procedural matters.  First, the Defendants

argue that the Court should abstain from exercising jurisdiction over the instant case as it will

impede the adjudication of the state court action currently pending below.  Second, the

Defendant also raises challenges regarding a conflict of interest on the part of Plaintiff's

representation.

### 1.   Discretionary Exercise of Jurisdiction under the Declaratory Judgment Act

Whether to abstain or not to abstain is the question.  More precisely, the Court must

determine, as Defendants urge, if its proper course of action is to decline from exercising its

jurisdiction afforded under the Declaratory Judgment Act, 28 U.S.C. § 2201.  The starting point

for this Court's inquiry is the statutory authority under which the instant suit is derived, namely,

the Declaratory Judgment Act, which provides that "[i]n a case of actual controversy within its

jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, *may*

declare the rights and other legal relations of any interested party seeking such a declaration..."

28 U.S.C. § 2201(a) (emphasis added). It is now well-established that "[t]his language affords

the district court 'discretion in determining whether and when to entertain an action under the

Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional

prerequisites." *Travelers Indemnity Company v. Bowling Green Professional Associates*, 495

F.3d 266, 271 (6th Cir. 2007) (quoting *Adrian Energy Assocs. v. Michigan Pub. Serv. Comm'n*,

481 F.3d 414, 421 (6th Cir. 2007).  The district courts' decision to exercise this "unique and

substantial" discretion must rest upon a "sound exercise of judgment" because "facts bearing on the usefulness of the declaratory judgment remedy, and fitness of the case for resolution, are peculiarly within [its] grasp." *Wilton v. Seven Falls Company*, 515 U.S. 277, 286 -89, 115 S. Ct. 2137, 132 L. Ed. 2d 214 (1995). In sum, "the propriety of declaratory relief in a particular case will depend upon a circumspect sense of its fitness informed by teachings and experience concerning the functions and extent of federal power." *Id.* at 287 (internal quotation omitted).

District Courts are frequently called upon to assess the propriety of a declaratory action stemming from insurance carriers seeking to validate the parameters of the contractual duties to their insureds. *Scottsdale Insurance Co. v. Roumph*, 211 F.3d 964, 967-68 (6th Cir. 2000) ("Several of the cases mentioned from Michigan involved insurance carriers seeking a declaratory judgment in federal court about defense and coverage when their insureds have been sued for alleged tort liability in state court concerning situations as a 'race to the courthouse,' state or federal, for a declaratory judgment determination."). Although there is not "a per se rule against exercising jurisdiction in actions involving insurance coverage questions," the Sixth Circuit has "repeatedly held in insurance coverage diversity cases that 'declaratory judgment actions seeking an advance opinion on indemnity issues are seldom helpful in resolving an ongoing action in another court.'" *Bituminous Casualty Corp. v. J&L Lumber Company, Inc.*, 373 F.3d 807, 812-13 (6th Cir. 2004) (internal quotation omitted). Therefore, the question currently facing this Court – whether to exercise is discretionary jurisdiction under the Declaratoy Judgment Act – is properly answered by the application of a five factor test first articulated in *Grand Trunk W. R.R. Co. v. Consol. Rail Co.*:

(1) Whether the declaratory action would settle the controversy;

(2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue;

(3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for res judicata;"

(4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and

(5) whether there is an alternative remedy which is better or more effective.

*Scottsdale Insurance Company v. Flowers*, 513 F.3d 546, 554 (6th Cir. 2008)(citing *Grand Trunk W. R.R. Co.*, 746 F.2d 323, 326 (6th Cir. 1984)).  The utilization of this test has been a source of frustration for the courts of this Circuit, as its application is fraught with splits in Sixth Circuit precedent itself.  *See Grange Mutual Casualty Co. v. Safeco Insurance Co. of America*, 565 F. Supp. 2d 779, 785-788 (E.D. Ky. 2008) (examining Sixth Circuit splits of authority as to the 5 factors).  However, the Sixth Circuit Court of Appeals in *Scottsdale Insurance Co. v. Flowers* has recently addressed, and thoroughly clarified, many of the splits emanating from the situation currently facing the undersigned. 513 F.3d 546 (6th Cir. 2008).  Based on the application of the foregoing factors, this Court now finds that the better exercise of its discretion is to exercise its jurisdiction under the Declaratory Judgment Act in order to clarify the contractual scope of coverage afforded under the subject insurance policy.

(a)     *Settlement of the Controversy & Clarification of the Legal Relations at Issue*

The first two factors are often considered in connection with one another.  *Flowers*, 513 F.3d at 557.  Examining the first factor, the Court must consider whether its judgment "would settle the controversy."  *Flowers*, 513 F.3d at 554.  As the *Flower* Court recognized, there is a distinct split of Sixth Circuit authority based upon "competing policy considerations of

8

consolidating litigation into one court versus permitting a party to determine its legal obligations as quickly as possible." *Id.* at 555. These competing policy rationales manifest themselves in two lines of divergent authority. The first, only requiring that the declaratory action settle the controversy regarding the scope of insurance coverage, even though it will not impact the underlying state court action. *Id.* at 555 (citing *e.g., West Am. Ins. Co. v. Prewitt*, 208 Fed. Appx. 393, 396 (6th Cir. 2006); *Northland Ins. Co. v. Stewart Title Guar. Co.*, 327 F.3d 448, 454 (6th Cir. 2003); and *Allstate Ins. Co. v. Green*, 825 F.2d 1061, 1066 (6th Cir. 1987)). In contrast, the second requires that the declaratory action settle the ultimate controversy between the parties which is on going in state court. *Flowers*, 513 F.3d at 555 (citing *e.g., Travelers*, 495 F.3d at 272; *U.S. Fire Ins. Co. v. Abex Aluminum, Inc.,* 161 Fed. Appx. 562, 565 (6th Cir. 2006); *Bituminous*, 373 F.3d at 814). In clarifying these divergent opinions, the *Flowers* court instructs district courts to examine, on a case-by-case basis, the differing underlying factual scenarios with an emphasis on: "whether the question was already being or could be considered in state court, whether the parties were the same in state and federal court, whether parties in the state action would be bound by the federal court action to which they were not a part, whether the issue was one being developed by state court discovery, and whether the scope of coverage or obligation to defend was before the state court." *Grange Mutual Casualty Co.*, 565 F. Supp.2d at 786 (citing *Flowers*, 513 F.3d at 555-56); *see also Badger Mutual Insurance Co. v. Ross Enterprises, Inc.*, No. 08-14223, 2009 WL 212116, *4 (E.D. Mich. Jan. 26, 2009) ("The *Flowers* court found that this factor may favor exercising jurisdiction when the plaintiff is not a party to the state litigation or there is a legal, and not a factual, dispute in federal court.").

Turning to the second factor, the Court must consider whether its judgment would clarify

9

the legal relations at issue. *Flowers*, 513 F.3d at 556-57. Similar to the above division, the

Court of Appeals has an equally split line of authority "concerning whether the district court's

decision must only clarify the legal relations presented in the declaratory judgment action or

whether it must also clarify the legal relations in the underlying state action." *Id.* at 557.

However, after examining the competing underlying policy rationales, the *Flowers* panel found

the former line of authority more persuasive:

> The requirement that the judgment clarify the legal relationships of the parties is
> based upon our desire for the declaratory judgment to provide a final resolution of
> the discrete dispute presented. While the parties may have other tortious or
> contractual relationships to clarify in state court, our concern is considering the
> second [] factor in such cases is with the ability of the federal declaratory
> judgment to resolve, once and finally, the question of the insurance indemnity
> obligation of the insurer. Thus, we focus only on whether a federal declaratory
> judgment will clarify the legal relationships presented to the district court.

*Id.* at 557.

Latching onto the inconsistent precedent, both parties assert that a declaratory judgment

action from this Court either will or will not settle the controversy. Unsurprisingly, Defendants

argue any judgment of this Court will not settle the underlying action because the liability of

Kobeissi and Al-Awad may still be imputed to S&P, regardless of this Court's findings

regarding Al-Mashhadi. On the other hand, Plaintiff argues that a judgment from this Court will

settle the discrete contract action before it, namely the scope of the Plaintiff's obligations toward

Al-Mashhadi under the Policy. Consideration of the first and second factor narrowly counsel

toward the exercise of jurisdiction.

Turning to the first factor – whether this court's decision will settle the controversy – the

Court finds that it does. The only question/controversy before this Court is whether the

10

insurance policy covers Al-Mashhadi as its insured.  Despite the aforementioned nature of Sixth

Circuit precedent, a determination of the instant question would have the effect of settling the

action before this Court, namely the scope of the insurance policy.

The tipping point for this Court's analysis was the sufficiently similar set of facts that

confronted the *Flowers* court.  In *Flowers*,  the Sixth Circuit affirmed, under an abuse of

discretion standard, the district court's exercise of discretionary jurisdiction.  *Flowers*, 513 F.3d

at 563.  Similar to the case at bar, the plaintiff insurance company sought a declaratory judgment

determining the scope of its insurance policy toward one of the insured's employees.    In

defining the scope of the policy, the district court was required to determine whether the actions

of the employee – having a sexual relationship with a patient – fell "within the scope of [his]

employment." *Id.* at 550.  The district court ultimately held, as a matter of Kentucky law, that

the employee's actions were outside the scope of his employment, and that the plaintiff insurance

company had no duty to extend coverage for any of the torts alleged in the state tort action.  *Id.*

at 550-51.  When reviewing the first discretionary factor, the Sixth Circuit found that the district

court's declaratory judgment did settle the controversy between the parties.  *Id.* at 556.

Specifically, the panel noted:

> [T]his [insurance liability] issue was not and could not be considered in the state
> court action because the [insurance company] was not a party to that action.
> Likewise, the issue involved a legal, not factual, dispute... and thus, unlike the
> controversy in *Bituminous*, did not require the district court to inquire into matters
> being developed through state court discovery.  The resolution of this issue by the
> district court resolved all controversies between the [insurance company],
> [torfeasing employee], and [injured state court plaintiff] because the only
> controversy between them regarded the scope of the insurance policy.

*Id.* at 556.  Although not factually identical, this analysis informs the Court's finding that the

first factor narrowly favors the exercise of discretionary jurisdiction under the Declaratory

Judgment Act.  The Plaintiff in the instant suit is also a party to the underlying state action,

which counsels against the exercise of discretion.  However, this factual difference is

incorporated in this Court's analysis of the fifth discretionary factor.  The Court also considered

the fact that the issue presented before this Court involved the identical legal question –  whether

an employee was acting in the scope of his employment, for purposes of the insurance policy –

which as demonstrated below can easily be disposed of as matter of law.[1]   Finally, similar to the

*Flowers* court, the resolution of the scope of the insurance liability issue resolves the coverage

_____

[1]  On this point, the Court considers whether this question, as alluded to by Defendants, is
so heavily fact-laden that its more appropriate for state court consideration like the factual
inquiry in *Bituminous*.  In *Bituminous*, the district court was called upon to determine whether or
not the defendant in the state court action was an "employee" for purposes of the insurance
policy.  373 F.3d 807 (6th Cir. 2004).  After exercising its discretion under the Declaratory
Judgment Act, the district court delved into the heavily fact-laden and highly contested issue of
whether the subject individual was an "employee," and held that he was an employee as a matter
of law.  *Id.* at 811.  When examining the first discretionary factor, the Sixth Circuit held that the
district court "should have declined to exercise jurisdiction over this declaratory judgment" and
particularly noted that his "employment status was a crucial issue" which was being addressed in
two state court forums (i.e. Kentucky state court, and Kentucky Department of Workers'
Claims).  *Id.* at 813-14.  The appellate court was particularly concerned with the duplicative and
potentially inconsistent nature of the highly-relevant factual inquiry into employment status,
which would complicate "underlying issues of liability."  *Id.*

Such considerations are not present here.  The issue before this Court – whether the Al-
Mashhadi was acting in the course of his employment – as demonstrated below is not of the
*Butiminous* variety.  The determination of this narrow issue does require some factual
investigation, and will obviously implicate the ultimate source of funding in the underlying suit.
The Court is also cognizant that this inquiry may also impact the entire basis of *respondeat
superior* liability currently set for trial in the state court proceeding.  However, such an action
has been upheld as permissible.  *Flowers*, 531 F.3d at 558 n.2 ("The state court's resolution of
the Morton Center's liability for Flowers' actions may rest on a consideration of whether
Flowers was acting within the scope of his employment...However, to the extent that the state
court finds the district court's decision to preclude its own consideration of whether Flowers was
acting within the scope of his employment by Morton Center, the district court would not have
confused the issue for the state court, but rather resolved them.").

issue as to EMC (insurer), Al-Mashhadi (tortfeasing employee), and Al-Baydany (injured state court plaintiff). Further weighing in favor of exercising jurisdiction is the fact that all parties in the state court litigation have been made a party to this case. *See Flowers*, 513 F.3d 556 n.1. This Court finds that the first factor favors the exercise of jurisdiction under the Declaratory Judgment Act.

Regarding the second factor – whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue – the Court finds that it would. "Indeed, it is almost always the case that if a declaratory judgment will settle the controversy, then it will clarify the legal relations in issue." *Id.* at 557. An order from this Court will clarify the legal relations at issue – specifically, the contractual duties owed by EMC based upon the acts of Al-Mashhadi. This order will clarify whether Al-Mashhadi is considered an "insured" under the Policy, and therefore, if EMC is required to pay Al-Baydany the amount of any state court judgment he may obtain against Al-Mashhadi only. This Court's order may declare the narrowly drawn legal relations at issue, and this factor weighs in favor of exercising jurisdiction under the Declaratory Judgment Act.

(b)       *Race for Res Judicata*

The third factor – whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for res judicata" – also weighs in favor of exercising discretionary jurisdiction. This factor is meant "to preclude jurisdiction for 'declaratory plaintiffs who file their suits mere days or weeks before the coercive suits filed a 'natural plaintiff' and who seem to have done so for the purpose of acquiring a favorable forum." *Flowers*, 513 F.3d at 558 (citing *AmSouth Bank v. Dale*, 386 F.3d 763, 788 (6th Cir. 2004)).

District courts are counseled not to "deny jurisdiction to a plaintiff who has not 'done any more than choose the jurisdiction of federal rather than state court, a choice given by Congress.'" *Flowers*, 513 F.3d at 558.  The district court must examine the record before it to determine if any "improper motive" exist on the part of the Plaintiff.

The Court finds that no such improper motive exists in this case.  The instant suit was not filed until December 25, 2008, well-after the April 27, 2007 commencement of the state court action. *Id.* ("Indeed, when the plaintiff has filed his claim after the state court litigation has begun, we have generally given the plaintiff 'the benefit of the doubt that no improper motive fueled the filing of [the] action.").  Defendants assert that the filing of the instant action and naming of all the parties in the underlying suit in this forum, instead of the state court, demonstrates such an improper motive.  However, simply choosing this forum over that of the state court is an insufficient basis for finding an improper motive under the third discretionary factor.

(c)   <em>Increased Friction Between Federal and State Courts</em>

The fourth factor –  whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction– weighs against this exercise of discretionary jurisdiction.  In determining whether such friction may exist, this Court must entertain three additional sub-factors:

> (1) whether the underlying factual issues are important to an informed resolution of the case;
>
> (2) whether the state trial court is in a better position to evaluate those factual issues than is the federal court; and
>
> (3) whether there is a close nexus between the underlying factual and legal issues and state law and/or public policy, or whether federal common or statutory law

14

dictates a resolution of the declaratory judgment action.

*Bituminous*, 373 F.3d at 814-815; *Flowers*, 513 F.3d at 560.  The first sub-factor "focuses on whether the state court's resolution of the factual issues in the case is necessary for the district court's resolution of the declaratory judgment action."  *Flowers*, 513 F.3d at 560.   The second sub-factor favors abstention when issues of unsettled state law are implicated.  *Travelers*, 495 F.3d at 272.  The third sub-factor favors abstention when the "issue in the federal action implicates important state policies and is, thus, more appropriately considered in state court."  *Flowers*, 513 F.3d at 561.  Applying these sub-factors to the instant case weighs against the exercise of discretionary jurisdiction.  Of the three sub-factors only one counsels toward accepting the invitation to exercise the Court's discretionary jurisdiction.

In regards to the initial sub-factor, the Court notes that the specific inquiry before it – whether Al-Mashhadi's actions were within the scope of his employment, for purposes of the Policy – overlaps with an inquiry that will be made for purposes of *respondeat superior* liability in the pending state court action.  Despite, Plaintiff's apparent posturing to the contrary, this analysis assuredly implicates certain factual inquires that will ultimately come before the state court.  While the Sixth Circuit has recognized that questions concerning the scope of insurance can "be resolved as a matter of law and do not require factual findings by a state court;" it also highlights that the exercise of jurisdiction may be inappropriate where the "resolution of the issue raised in federal court will require making factual findings that might conflict with similar findings made by the state court."  *Id.* at 560; *see also Northland Insurance Company*, 327 F.3d at 454.  The inquiry before this Court falls in the latter category.  Although unlikely, it is plausible, that the state court could reach an inconsistent holding as to whether Al-Mashhadi's

15

actions were within the scope of employment.  This Court would be remiss to act as if it were impossible for its factual findings to conflict with those of the state court.

On the other hand, the second sub-factor weighs in favor of exercising discretionary jurisdiction.  The second sub-factor ask this Court to determine which court is "in a better position to resolve the issues in the declaratory action."  *Flowers*, 513 F.3d at 560.  The heart of the inquiry is whether there are any novel or unresolved issues of state law.  *Id.*; *Bituminous*, 373 F.3d at 815-16.  The issue presented to this Court does not implicate any such novel or unresolved issues.  As demonstrated below, issues governing the scope of employment when dealing with a firearm have been thoroughly addressed by Michigan courts.  *Flowers*, 513 F.3d at 560. ("This consideration appears to have less force when the state law is clear and when the state court is not considering the issues.").

The third sub-factor similarly requires this Court to discern if there are any important state policies which are more appropriately considered by the state court.  State courts will always have an interest in "regulat[ing] insurance companies for the protection of their residents, and state courts are best situated to identify and enforce public policies that form the foundation of such regulation."  *Bituminous*, 373 F.3d at 815.  However, this Court finds that the resolution of the pending contract interpretation issue before it does not implicate state law or policy as to render its jurisdiction inappropriate.  *See Northland*, 327 F.3d at 454 (finding that, although the resolution of the declaratory judgment action seeking a determination of the scope of an insurance policy was governed by state contract law, "no state law or policy would be frustrated by the district court's exercise of jurisdiction, which would require the application of Michigan law").  In any event, following the lead of *Flowers*, this Court finds that Michigan Courts are in

16

a better position to resolve the insurance policy interpretation in this case. *Flowers*, 513 F.3d at 561. The balance of these sub-factors, and consequently, the fourth discretionary factor weigh against the exercise of discretionary jurisdiction.

(d)   *Availability of Alternative Remedy*

The final discretionary factor –  whether there is an alternative remedy which is better or more effective – counsels against an exercise of discretionary jurisdiction under the Declaratory Judgment Act. This factor, like the first two factors, has been subjected to a split of authority among the panels in this Circuit based again on competing policies. *Flowers*, 513 F.3d at 562. Some decisions have found that intervention in the pending state court action would "not have necessarily provided a better or more effective alternative remedy." *Northland*, 327 F.3d at 448. While other decisions have found that the plaintiff's should "have presented its case to the same court that will decide the underlying tort action." *Bituminous*, 373 F.3d at 815. In an effort to reconcile this split, the *Flowers* court recommends that "inquiry on this factor must be fact specific, involving considerations of the whole package of options available to the federal declaratory plaintiff." *Flowers*, 513 F.3d at 562.

The facts of this case tend to demonstrate that Plaintiff had an adequate alternative remedy. It is undisputed that Plaintiff successfully intervened, and is currently a party in the underlying suit. Michigan permits insurers to bring declaratory judgment actions in state court. *See* Mich. Ct. R. 2.605; *see also Rose v. State Farm Mut. Auto. Ins. Co.*, 274 Mich. App. 291, 294, 732 N.W.2d 160, 162 (Mich. Ct. App. 2006). Equally relevant, the state court could have easily, and most likely will address, whether Al-Mashhadi was acting in the scope of his employment, for tort purposes. Although the state court judge may be statutorily prohibited

17

from resolving the policy coverage issue within the underlying suit, M.C.L. § 500.3030, she may still retain jurisdiction over an ancillary declaratory suit which resolves the related scope of coverage issue. Mich. Ct. R. 2.605. This factor weighs against exercising discretionary jurisdiction under the Declaratory Judgment Act.

(e)    *Balancing the Factors*

The Sixth Circuit has "never indicated how these [] factors should be balanced." *Flowers*, 513 F.3d at 563. In this case, the first three factors point toward exercising jurisdiction, while the latter two counsel against exercising jurisdiction. In light of the foregoing, the Court finds the instant case to be a proper one for the exercise of its discretionary jurisdiction under the Declaratory Judgment Act.

2.    Conflict of Interests

Defendant Hamed Al-Mashhadi asserts what he perceives to be an impermissible conflict of interest on the part of Plaintiff's counsel, Carson Tucker of Zausmer Kaufman August Caldwell & Taylor, P.C. ("Zausmer Firm"). Specifically, Defendant alleges that the Zausmer Firm has violated Michigan Rule of Professional Conduct ("MRPC")Rule 1.7 by representing both Employers Mutual Casualty ("EMC") in the instant suit, and its insureds: Schaefer & Puritan, Inc., Hamed Al-Mashhadi, and Adel Kobeissi in the underlying action currently pending in the Wayne County Circuit Court. This dual representation, Defendant Al-Mashhadi contends, will lead to an inevitable conflict of interests if Plaintiff EMC is able to obtain a judgment from this Court, because such a result may require the Zausmer Firm's other clients to personally satisfy any judgment obtained in the underlying action. In response, Plaintiff argues that: (1) Defendant does not have standing to raise conflict of interest issues in this declaratory judgment

18

action; and (2) there is no conflict of interest under MRPC 1.7(a).

With respect to conflict of interest, MRPC 1.7(a) states, "[a] lawyer shall not represent a client if the representation of that client will be directly adverse to another client..."  It is a firmly embedded ethical principle that "an attorney owes undivided allegiance to a client and usually may not represent parties on both sides of a dispute."  *Evans & Luptak v. Lizza*, 251 Mich. App. 187, 197, 650 N.W.2d 364 (2002) (internal quotation omitted).  A party seeking the disqualification of counsel "bears the burden of demonstrating specifically how and as to what issues in the case the likelihood of prejudice will result."  *Rymal v. Baergen*, 262 Mich. App. 274, 319, 686 N.W.2d 241 (2004).  An attorney who violates this rule may be disqualified as counsel; however, as disqualification is an "extreme sanction," courts should only employ it when there is a "reasonable possibility that some specifically identifiable impropriety" actually occurred, and where the public interest in requiring professional conduct by an attorney outweighs the competing interest of allowing a party to retain the counsel of his or her choice. *DeBiasi v. Charter County of Wayne*, 284 F. Supp.2d 760, 770 (E.D. Mich. 2003) (internal citations omitted).

The Court dispenses with Plaintiff's initial contention that the Defendants lack standing to raise this issue as the comments accompanying Rule 1.7 specifically address "Conflict Charged by an Opposing Party."  As the comment instructs, there are times when opposing counsel may properly raise the question when a conflict is such that it calls "into question the fair or efficient administration of justice." M.R.P.C. 1.7 comments.  However, "[s]uch an objection should be viewed with caution..., for it can be misused as a technique of harassment." *Id.; see also  Manning v. Waring, Cox, James, Sklar & Allen*, 849 F.2d 222, 224 (6th Cir. 1988)

19

("Unquestionably, the ability to deny one's opponent the service of capable counsel, is a potent weapon.  Confronted with such a motion, courts must be sensitive to the competing public policy interests of preserving client confidences and of permitting a party to retain counsel of his choice.").  Defendants are more than capable, and have standing to raise the issue concerning a potential conflict of interests; however, whether such a conflict of interest exists is a completely different matter.

"The general rule is that '[w]hile lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.8(c), 1.9(a) or (c), or 2.2.  *Barkley v. City of Detroit*, 204 Mich. App. 194, 208, 514 N.W.2d 242 (Mich. Ct. App. 1994) (citing MRPC 1.10(a)).  In many instances, a "so-called 'Chinese wall' might be erected such that a disqualified attorney would have neither a role in the case nor any contact with the attorneys actually involved in the case, so that the result would be the same as if two separate firms were involved."  *Barkley*, 204 Mich. App. at 208.  However, this Court is not unaware of circumstances unique to insurer-driven litigation.  *Atlanta International Ins. Co. v. Bell*, 438 Mich. 512, 519, 475 N.W.2d 294 (Mich. 1991) ("courts and commentators recognize universally that the tripartite relationship between insured, insurer, and defense counsel contain rife possibility of conflict.  The interests of the insurer frequently differ.").  The Michigan Supreme Court has aptly described the peculiar strictures of this tripartite relationship:

> [T]he relationship between the insurer and the retained defense counsel, while less than a client-attorney relationship, unquestionably differs from the relationship between a defense counsel and a party-opponent.  The relationship differs because "[l]iability insurance policies typically include provisions that both obligate the insurer to provide the insured with a defense and entitle the insurer to control the defense ...[;] the insurer has both a 'duty' and a 'right' in

20

regard to the defense of the insured...."  It has been appropriately recognized that "[defense counsel] occupies a fiduciary relationship to the insured, as well as to the insurance company ... [and] implicitly, if not explicitly, represents to the insured the ability to exercise professional competence and skill in conducting the insured's defense."

*Atlanta International Insurance Co. v. Bell*, 438 Mich. 512, 519, 475 N.W.2d 294 (Mich. 1991).

The initial inquiry when addressing assertions of a conflict of interest under M.R.P.C. 1.7(a) is to determine "whether a lawyer's representation of a client will be 'directly adverse' to the interest of another client."  *Avink v. SMG*, 282 Mich. App. 110, 117, 761 N.W.2d 826 (Mich. Ct. App. 2009).  "Clients' interests are directly adverse when one client sues another client."  *Id.* After careful review of the relations involved in the present matter, the Court concludes that there is no conflict of interest because there is no "directly adverse" interests.  In the matter before this Court, Plaintiff EMC (represented by Carson Tucker of the Zausmer Firm) is only seeking a declaratory action as to EMC's rights and duties in regards to Defendant Al-Mashhadi, a determination which is not adverse to the Zausmer Firm's clients in the underlying matter, S&P and Kobeissi, represented by Heidi Hudson.  Further, any potential for an adverse relationship would arise from the dual representation of Al-Mashhadi.  However, EMC has retained a different firm to represent Al-Mashhadi in the underlying suit.  The Court finds no reason to compel the withdrawal of the Zausmer Firm from this matter.

## B.    Summary Judgment

As previously noted, Plaintiff seeks a declaration of its duties owed under the Policy toward Defendant Al-Mashhadi.  Specifically, Plaintiff claims that it owes no duty to indemnify or defend Al-Mashhadi because he was not acting within the scope of his employment, or performing duties related to the conduct of the business of S&P at the time of the shooting.

Therefore, Plaintiff contends, that Al-Mashhadi cannot be considered an "insured" for purposes

of the Policy.  Alternatively, Plaintiff argues that the shooting was not an "occurrence" covered

by the Policy because the "bodily injury" was "expected or intended from the standpoint of the

insured."  In response, Defendants argue that discovery must be conducted in relation to Al-

Mashhadi's status at the time of the incident.  Responding to the alternative argument,

Defendants claim that issues of fact preclude summary judgment.

In diversity cases, this Court applies Michigan law to determine the scope of Plaintiff's

insurance coverage of Al-Mashhadi.  *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S. Ct.

817, 82 L. Ed. 1188 (1938); *Northland*, 327 F.3d at 455.  In so doing, the Court is instructed to

rule in accordance with controlling decisions of the Michigan Supreme Court.  *Prestige Casualty*

*Company v. Michigan Mutual Insurance Co.*, 99 F.3d 1340, 1348 (6th Cir. 1996).  If the state

supreme court has not yet addressed the issue presented, this Court will predict how that court

would rule, by looking to "all available data."  *Kingsley Assoc. v. Moll PlastiCrafters, Inc.*, 65

F.3d 498, 507 (6th Cir. 1995).  "Relevant data includes decisions of the state appellate courts,

and those decisions should not be disregarded unless [the Court is] presented with persuasive

data that the Michigan Supreme Court would decide otherwise."  *Id.*

The primary issue before this Court concerns the interpretation of the insurance policy.

Defendant submits that Al-Mashhadi was not an "insured" under the policy, and therefore EMC

is not required to defend or indemnify him in the underlying lawsuit.  The determination whether

an insurer is contractually obligated under its policy to defend certain claims requires

interpretation of the insurance contract.  *American Bumper & Mfg. Co. v. Nat'l Union Fire Ins.*

*Co.*, 261 Mich. App. 367, 375, 683 N.W.2d 161 (Mich. Ct. App. 2004). The interpretation of an

insurance policy is a question of law.  *Klapp v. United Ins. Group Agency, Inc.*, 468 Mich. 459, 463, 469, 663 N.W.2d 447 (Mich. 2003).  To resolve this question, the Court looks to traditional state insurance and contract law.  *Prestige*, 99 F.3d at 1350.  "In Michigan, an insurance policy is just like any other contract – it is an agreement between parties 'in which a court will determine what the agreement was and effectuate the intent of the parties.'" *Id.* (quoting *Auto-Owners Ins. Co. v. Churchman*, 440 Mich. 560, 489 N.W.2d 431, 433-34 (Mich. 1992)).  In so doing, "the court looks to the contract as a whole and gives meaning to all the terms if they serve a reasonable purpose."  *Prestige*, 99 F.3d at 1350 (citing *Churchman*, 489 N.W.2d at 433; *and Fresard v. Michigan Millers Mut. Ins. Co.*, 414 Mich. 686, 327 N.W.2d 286, 289 (Mich.1982)).  "The intent of the parties is to be gathered from the four corners of the instrument."  *Prestige*, 99 F.3d at 1350 (citing *Rogers v. Great Northern Life Ins. Co.*, 284 Mich. 660, 279 N.W. 906, 908 (Mich. 1938)).

If a term is not defined in the insurance policy, the court must interpret it according to its commonly used meaning, taking into account the reasonable expectations of the parties.  *Prestige*, 99 F.3d at 1350 (citing *Anderson Development Co. v. Travelers Indem. Co.*, 49 F.3d 1128, 1131 (6th Cir. 1995)).  In other words, "the policy language in the insurance contract is to be accorded its commonly used meaning unless it is apparent from reading the instrument as a whole that a different or special meaning was intended."  *Prestige*, 99 F.3d at 1350.

The controlling provision for determining who qualified as an "insured" under the policy, provides:

> [S&P's] "volunteer workers" only while performing duties related to conduct of your business, or your "employees", other than either your "executive officers"...
> or your managers ... but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business.

23

[Business Owners' Policy §2(c), Plaintiff's Mot. for Summ. J., Ex. E p. 35]. The Court finds no ambiguity in the above contractual interpretation, and will proceed to effectuate the intent of the parties. Employees are considered "insured," but only for acts "within the scope of their employment," or for acts occurring "while performing duties related to the conduct of [S&P]. The provision essentially establishes that in order for Al-Mashhadi, and all other employees of S&P, to qualify for coverage under the Policy their actions must either (1) be in the course of their employment, or (2) be in the performance of duties related to the operation of the gas station. Al-Mashhadi's discharge of the .22 rifle must have fallen within one of these two categories. The Court finds that it did not.

Viewing the evidence in a light most favorable to the Defendants, the Court holds that there is insufficient disagreement to require submission to a jury concerning whether Al-Mashhadi's conduct was within the scope of his employment. As the dispositive terms are undefined in the Policy, the Court must construe them in accordance with their commonly used meaning. "While the issue of whether the employee was acting within the scope of his employment is generally for the trier of fact, the issue may be decided as a matter of law where it is clear that the employee was acting to accomplish some purpose of his own." *Bryant v. C.J. Brannen*, 180 Mich. App. 87, 98, 446 N.W.2d 847 (Mich. Ct. App. 1989). In making such a determination, Michigan courts utilize the factors found in 1 Restatement Agency, 2d, § 229, p. 506, which provides:

> (1) To be within the scope of the employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized.
>
> (2) In determining whether or not the conduct, although not authorized, is nevertheless so similar to or incidental to the conduct authorized as to be within the scope of employment, the following matters of fact are to be considered:

24

(a) whether or not the act is one commonly done by such servants;

(b) the time place and purpose of the act;

(c) the previous relations between the master and the servant;

(d) the extent to which the business of the master is apportioned between different servants;

(e) whether or not the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant;

(f) whether or not the master has reason to expect that such an act will be done;

(g) the similarity in quality of the act done to the act authorized;

(h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant;

(i) the extent of departure from the normal method of accomplishing an authorized result; and

(j) whether or not the act is seriously criminal.

*Id.*; *Bryant*, 180 Mich. App. at 99-100.

Application of the aforementioned factors and a review of the undisputed facts of this case plainly demonstrate that Al-Mashhadi's actions, that led to the shooting of Al-Baydany, were not taken within the scope of his employment, nor where they related to the performance of his duties as a cashier for the gas station. First, the Court notes that Al-Mashaddi was off-duty at the time of the shooting, both parties conceded that Al-Awad came to relieve Al-Mashaddi at the conclusion of his shift around 11:00p.m. Secondly, Al-Mashhadi, has not proffered any arguable reason that demonstrates how dancing around with a gun was in any way related to his duties as a cashier. Thirdly, eye witness testimony substantiates that prior to the discharge of the riffle that the Defendants were playing loud music, laughing, dancing, and video-recording one

25

another on their cellular phones.  Based on Al-Mashhadi deposition testimony, the Court notes that he engaged in conduct prohibited by S&P management, specifically, allowing friends and customers inside the Plexiglass area behind the counter.  These violations of S&P protocol further buttress this Court's finding that Al-Mashhadi was not acting in the scope of his employment or otherwise related to his duties as a cashier.

As demonstrated by the following deposition exchange, Al-Mashhadi admitted that there was no safety-related reason to use the .22 rifle in the performance of his duties as a cashier:

> Q.     ... had Mr. Kobeissi told you, "Look, if there's ever a problem, stay in the cashier area, make sure the door's locked, and call 911 for help," or words to that effect?
>
> A.     Yes. He, for my safety, of course he did.

[Deposition of Al-Mashhadi, Pl.'s Mot. for Summ. J., Ex. B, p.40].  Even if, as Defendants allege, the gun was purchased for safety reasons, no such safety concern was implicated the night of the shooting.  In this same vein, Defendants have not proffered any evidence of an arguable employment duty that would require Al-Mashhadi to handle the rifle on the night of the shooting.

Nor is this Court persuaded by Defendants' assertion that additional factual discovery is required before the Court should rule.  In support of this assertion, Defendants provide two reasons why this Court's judgment may be premature.  First, in regards to Al-Mashhadi's assertion of his Fifth Amendment privilege, Defendants' claim "efforts are underway to reschedule his deposition and determine if he will relinquish those rights and give testimony." [Defs.' Resp. to Pl.'s Mot. for Summ. J., p. 5].  However, there is sufficient testimony in the record to substantiate this Court's findings for purposes of the narrow question of contract

interpretation.  Second, Defendants point to a pending request for documentation as to the sign in/out sheets, employee information and records.  Again, the Court is unpersuaded by these arguments, especially in light of the deposition testimony that supplies much of the information contained in the requested documents.  This Court finds, viewing the evidence in a light most favorable to the Defendants, that Al-Mashhadi was neither acting in the scope of his employment nor performing his duties as a cashier when discharging the .22 riffle on January 5, 2007.  *See Martin v. Jones*, 302 Mich. 355, 4 N.W.2d 686 (Mich. 1942) (wherein the court held as a matter of law that a gas station manager was not acting in scope of his employment when shooting a customer).  Al-Mashhadi cannot be considered an "insured" for purposes of the Policy at issue, and EMC is not contractually obligated to either defend or indemnify Al-Mashhadi in the underlying suit.  Having found that Plaintiff is not an "insured" under the Policy, this Court declines to address Plaintiff's alternative argument.

## V.    CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendant Al-Mashhadi's Motion to Disqualify Counsel **[Docket No. 15, filed March 26, 2009]** is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Al-Baydany's Motion to Dismiss **[Docket No. 16, filed March 31, 2009]** is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment **[Docket No. 13, filed March 19, 2009]** is **GRANTED**.

**IT IS DECLARED** that:

(1) Defendant Hamed Al-Mashhadi is not an "insured" under the language of the Policy; and

27

(2) Plaintiff Employers Mutual Casualty is not contractually obligated to either indemnify or defend Al-Mashhadi in the underlying suit.


S/Denise Page Hood
Denise Page Hood
United States District Judge

Dated:  August 24, 2009

    I hereby certify that a copy of the foregoing document was served upon counsel of record on August 24, 2009, by electronic and/or ordinary mail.

S/William F. Lewis
Case Manager